**UNITED STATES v. CERTAIN PARCELS OF LAND IN CITY OF BALTIMORE, STATE OF MARYLAND, et al.**

No. 2113.

District Court, D. Maryland.

May 9, 1944.

Wilmer H. Driver, Sp. Asst. to Atty. Gen., for the United States.

Mason P. Morfit, Charles G. Page, and Edwin Harlan, all of Baltimore, Md., for Pullman Standard Car Mfg. Co.

Simon E. Sobeloff, City Sol., and A. A. Davis, Atty: for Mayor and City Council, both of Baltimore, Md., for Mayor and City Council of Baltimore.

CHESNUT, District Judge.

 This federal condemnation case presents an extraordinary situation in both form and substance. The form of the petition of condemnation itself is not unprecedented in these recent war-time years, but the subject matter to which it relates is most unusual. To understand it, it is necessary to state the factual background from which the condemnation case has emerged. This is reflected in the answer of the property owner, the Pullman-Standard Car Manufacturing Company which objects to the right of the government to condemn the property under the special circumstances. The government, represented by the Maritime Commission, has in effect demurred to the sufficiency of the owner's answer. Under the Maryland procedure, which is here applicable, this demurrer "mounts" to the original petition which is thus open to the question of its sufficiency.

 The pleadings in the case so far are quite inartificial to this type of case. The Federal Rules of Civil Procedure, rule 81(a) (7), 28 U.S.C.A. following section 723c, apply to appeals but not to trials in condemnation cases. In Maryland a petition for condemnation of property is classed as a suit at law. Ridgely v. City of Baltimore, 119 Md. 567, 87 A. 909; Davis v. Board of Education, 168 Md. 74, 176 A. 878. Nevertheless the objection interposed by the property owner here is cast in the form of an answer to a bill in equity. Again, the government's reply is not in form either a replication or a demurrer in accordance with common law pleading in actions at law in Maryland. In effect I take it to be intended as a demurrer to the sufficiency of the answer. But I will put aside the informality of the pleadings in order to state and consider the substantial points of law in the case, as I understand this is the desire of counsel. The argument on the pleadings has in effect been largely a pre-trial hearing.

The situation then is found to be this. On February 4, 1941 the Pullman-Standard

Car Manufacturing Company (hereinafter called "Pullman") owned and operated a large plant in Baltimore for the manufacture of railroad cars. At that time the government desired to have the plant converted into a plant for prefabricating steel for shipbuilding; and on the date mentioned entered into a "government-owned facilities contract" with the Bethlehem-Fairfield Shipbuilding Company, providing for the leasing by the Bethlehem Company of the plant facilities of Pullman, the construction of additional necessary facilities for producing parts for shipbuilding, and looking to the making of subsequent contracts for the construction of vessels by Bethlehem.

The contract provided in substance for the procurement by Bethlehem of a lease from Pullman satisfactory in form and substance to the government. Such a lease was made between Pullman and Bethlehem dated March 18, 1941. It provided in substance the payment of $260,000 a year rental and was made for a term of two years ending March 31, 1943, with the right of renewal for three successive terms of one year each, the term of the third and final renewal to end March 31, 1946, provided the lessee gave the lessor six months notice in writing. The rent was to be paid in advance quarterly on the first days of each January, April, July and October, defaulted payments to bear interest at 6%, and the lessee to pay all general property taxes, both real and personal, and any special assessments. The lease was not assignable except as therein provided that the government might substitute itself as lessee. The lessee was to be entitled to make changes and alterations in the property but was required, upon termination of the lease, to restore the property to its original condition at the beginning of the lease, ordinary wear and tear excepted. The lessee had the right to remove all buildings and improvements erected during occupancy under the lease. As between the government and Bethlehem the government agreed to pay all expenses incurred by Bethlehem under the lease. If the government took over the lease it was to be bound by the conditions imposed on Bethlehem. The government also had the right to take over the lease in case of termination by Pullman on account of any default of Bethlehem. The facilities contract was annexed to and made a part of the lease.

The government was fully advised of and approved the terms of the lease.

After Bethlehem went into possession under the lease very extensive changes and alterations in the buildings and improvements on the property were made. In fact it has been converted from a car-building plant into a plant for prefabricated steel for shipbuilding with very elaborate machinery and equipment, and it is a matter of public knowledge that in the last three years many Liberty ships have been completely built, launched and equipped by Bethlehem under its contracts with the government, in a nearby plant.

On September 28, 1942, the lease was renewed by Bethlehem for a term to expire March 31, 1944. On December 2, 1943, the government filed its petition for condemnation in this case. At that time there was apparently no default either by the lessor or the lessee under the lease and the rental had been paid in advance on October 1, 1943 for the ensuing quarter. Contemporaneously with filing the petition for condemnation, the government sent a telegram to Bethlehem notifying it that the condemnation proceeding had been filed and that therefore it was entitled under the provisions of the Second War Powers Act to immediate possession, and Bethlehem was instructed to pay no further rentals under the lease and to recover from Pullman any portion of the advance rental previously paid; and also to give immediate notice to Pullman that Bethlehem was not bound by the terms of the lease subsequent to December 2, 1943; but that Bethlehem should continue to use the property in performance of contracts with the Maritime Commission, not under the lease but pursuant to instructions from the Commission. Thereafter on December 10, 1943 Bethlehem gave similar notice to Pullman quoting the telegram. No further payment of rentals has been made to Pullman.

The petition for condemnation itself reveals nothing of this special situation with regard to the property. It merely indicates that the plant had been leased by Pullman to Bethlehem. The petition refers to the following statutes and executive orders as authority for the taking.

Executive Order 9129 dated April 13, 1942, 50 U.S.C.A.Appendix.

Act of Congress approved August 1, 1888, 40 U.S.C.A. § 632 note; § 257 et seq.

Act of Congress approved August 25, 1941, public law 247, 77th Cong. 55 Stat. 669.

Act of Congress approved March 5, 1942, public law 474, 77th Cong., 56 Stat. 128.

The Merchant Marine Act of 1936 as amended, 46 U.S.C.A. § 1101 et seq.

Act of Congress approved March 27, 1942, designated as the Second War Powers Act, 56 Stat. 176, c. 199, 50 U.S.C.A.Appendix § 631 et seq.

The petition does not seek to condemn the property in fee but only the use of the property which is thus described—

"the exclusive use and occupation of the hereinafter described lands, together with all buildings and structures located thereon, and together with all railroad and industrial tracks, machinery, and equipment and patterns for the repair thereof, fixtures, shop rolling stock, tools and any and all factory and administrative equipment in or upon said premises on March 18, 1941, for a period ending one year from the date of institution of this condemnation proceeding, and, at the election of the United States Maritime Commission, for additional yearly periods thereafter during the present states of war, and one year thereafter, with all buildings, structures, fixtures, and improvements placed upon the land to be and remain the property of the United States of America, and with the right of the United States of America to remove any and all structures, buildings, fixtures, improvements and all property, real or personal placed thereon by, for or at the expense of the United States of America."

The petition described the land so to be condemned by adequate title description, but does not itemize or particularly describe any of the buildings or improvements or personal property, machinery or tools and equipment otherwise than generally referred to, except that it is importantly to be noted that in very general terms there is included in the condemnation "any and all factory and administrative equipment in or upon the said premises on *March 18, 1941.*" As the condemnation proceeding was not filed until December 2, 1943, it is certainly most unusual for the condemnation to apply to personal property said to have been on the premises more than two years before but not stated to have been there at the time of filing the petition for condemnation, and without any particular description of such property in kind, character or location.

It is also important to note that the petition did not ask for a court order for immediate possession by the government of the property, nor was there filed with the proceeding any order for taking by the government, nor was any deposit made of estimated compensation in accordance with 40 U.S.C.A. § 258a. The only order signed on the petition was the usual and conventional one that the clerk give notice to the parties mentioned in the proceeding, and requiring them to answer by a certain date. This is in accordance with the Maryland procedure. See Maryland Code 1939, Art. 33A, § 3.

It is also to be noted that up to the present time, May 5, 1944, six months after the condemnation proceeding was filed and the parties notified, Bethlehem has filed no answer or claim in the case. Apparently it is quite content to accept the government's position in the matter and to make no claim for compensation for the taking by the government. It is further to be noted that the government is seeking to condemn merely the right to use of the property both real and personal, for an indeterminate period in the future.

Apparently the government takes the position that it is now in possession of the property not under the terms of the lease but under the terms of the condemnation, although it has not obtained any court order for possession. Possession seems to be claimed as a matter of right without court order under the Second War Powers Act. In view of this it appears that the government's war effort will in no way be impeded by the disposition of this case, according to its contentions, and that the only purpose of the case is to determine the rental hereafter to be paid by the government for the use of the property for an indeterminate period. The position of Pullman thereon stated is that under its contract with Bethlehem the government had the right to take over the lease directly and that in effect it has done so by the notice of December 2, 1943; and that its only purpose and object in filing the condemnation is to repudiate the terms of the lease and to obtain the use of the property if legally possible at a lower rental than that fixed in the lease.

In this unusual situation the following questions of law seem to arise:

1. Under the circumstances, has the government the power to condemn the mere use of the property at all?

2. If the power generally exists to condemn the use, has it the power to condemn a term of use that is indeterminate, that is, for a period of one year from December 2, 1943, with the option of renewal for additional yearly periods for an indeterminate time.

3. Has the government power under the Second War Powers Act to condemn the mere use (as distinct from the property thereunder) of personal property such as removable machinery, equipment and fixtures, shop rolling stock, tools and other factory and administrative equipment.

4. And in any event, is the petition for condemnation sufficiently definite and certain with respect to purely personal property "in or upon the said premises on March 18, 1941."

Pullman does not dispute the power of the government to condemn the fee interest in its property; nor does it dispute the general power of the government to condemn a leasehold interest in the property for a fixed period of time as for one, two or five years; but it does dispute the power of the government to condemn a leasehold interest for one year with the *option* to continue the holding for an indeterminate number of years in the future. It contends that the mere option to take property may not be condemned at all and *a fortiori* a continuing option from year to year for an indeterminate period is not within the general power to condemn. As to the latter, this objection is principally based on the contention that the vague and uncertain nature of the extent of the condemnation makes it practically impossible to determine the "just compensation" to which the property owner is entitled under the fifth amendment. Pullman also contends that under the special situation set up in its answer, the government should be precluded or estopped from seeking to condemn a mere leasehold interest in the property at all because in effect by what it has done, it is already the lessee of the property and bound by the terms of the lease from Pullman to Bethlehem.

We must first distinguish between the *power* to condemn and the exercise of the power in the particular case. As to power itself, it is sufficient to quote the language used by Congress in the Second War Powers Act, 50 U.S.C.A.Appendix § 632. This was title 2 of the Act and reads as follows:

"632. The Act of July 2, 1917, (40 Stat. 241) [Title 50, § 171], entitled 'An Act to authorize condemnation proceedings of lands for military purposes', as amended, is hereby amended by adding at the end thereof the following section: 'Sec. 2. The Secretary of War, the Secretary of the Navy, or any other officer, board, commission, or governmental corporation authorized by the President, may acquire by purchase, donation, or other means of transfer, or may cause proceedings to be instituted in any court having jurisdiction of such proceedings, to acquire by condemnation, any real property, temporary use thereof, or other interest therein, together with any personal property located thereon or used therewith, that shall be deemed necessary, for military, naval, or other war purposes, such proceedings to be in accordance with the Act of August 1, 1888 (25 Stat. 357) [Title 40, §§ 257, 258], or any other applicable Federal statute, and may dispose of such property or interest therein by sale, lease, or otherwise, in accordance with section 1(b) of the Act of July 2, 1940 (54 Stat. 712), section [1171(b) of this Appendix]. Upon or after the filing of the condemnation petition, immediate possession may be taken and the property may be occupied, used, and improved for the purposes of this Act [This section and section 171 of Title 50], notwithstanding any other law. Property acquired by purchase, donation, or other means of transfer may be occupied, used, and improved, for the purposes of this section prior to the approval of title by the Attorney General as required by section 355 of the Revised Statutes, as amended [Title 33, § 733; Title 34, § 520; Title 40, § 255; Title 50, § 175].'"

By Executive Order No. 9129, April 13, 1942, 7 F.R. 2810 (see 50 U.S.C.A.Appendix § 632 note), the President authorized the United States Maritime Commission to exercise the authority contained in title 2 of the Second War Powers Act of 1942.

It will be noted that section 632 expresses the grant of power with respect to "any real property, temporary use thereof, or other interest therein, together with any personal property located thereon or used therewith." Governmental acquisition of leasehold interests in real property by con-

demnation has been unusual heretofore, but in recent federal decisions in district court cases the exercise of the power has been upheld although it may be said that none of these decisions involved circumstances at all analogous to those in the instant case. See United States v. 16,747 Acres, D.C.Del., 50 F.Supp. 389; United States v. 5.741 Acres, D.C.N.Y., 51 F.Supp. 147; United States v. 9.94 Acres, D.C.S.C., 51 F.Supp. 478; United States v. 60,000 Square Feet of Land, D.C.Cal., 53 F.Supp. 767. Although all these decisions uphold the right of the government to condemn leasehold interests for a particular period with an option to continue from year to year for an indeterminate period, they show disparity of view as to the time when and the method of determining just compensation to the property owner. Apart from the unanimity of the decisions as to the existence of the power itself, I also think on principle, considering the nature of the power of eminent domain as a sovereign power, especially in the exercise of the public defense in time of war, and on the express wording of the Second War Powers Act, the government does have the right to acquire by condemnation the leasehold interest from year to year, under the option specified in the petition for condemnation in this case, at least so far as the real property itself is concerned. I think the option of renewal is within the meaning of "other interest" in real property expressed in the statute.

 Further, in my opinion, the special situation set up in Pullman's answer does not constitute an estoppel against the government in the exercise of the power to condemn. It is true that the answer, if sustained by proof, furnishes color to Pullman's contention that the real object of the condemnation proceeding is to repudiate the lease and obtain the use of the property at a lower rental if so determined by a jury. And I understood the United States Attorney in this case to substantially admit this was the main purpose of the proceeding. But even so, this does not constitute an estoppel against the government from the exercise of the sovereign and important power of condemnation. I have found nothing in the "facilities" contract, nor in the lease on which to base this estoppel, and of course ordinarily the government is not estopped from the exercise of necessarily inherent powers, such an eminent domain, anyhow.

Galveston Wharf Co. v. Galveston, 260 U. S. 473, 43 S.Ct. 168, 67 L.Ed. 355; United States v. Certain Lands, D.C., 48 F.Supp. 306. It is true also that the government by the condemnation in this case will apparently get no greater or other interest in the property, than it could have obtained under the terms of the lease. But it is important to note that there is nothing in the contract or the lease which imposed the *obligation* (as distinct from the option) on the government to take over the lease directly. Its action, therefore, in taking over possession under the Second War Powers Act and by this condemnation proceeding is legally distinct from the exercise by it of the option under the lease and contract. Whether in the circumstances the exercise of the power is a reasonable one is not within the province of the court to determine, when it is found that it is a lawful exercise of executive power.

The more difficult question is how to determine the just compensation in view of the uncertainty of the extent of the interests condemned; and there is the further difficulty as to how and when this just compensation is to be made payable. Here the cases above referred to show diversity of view. In the Delaware case the condemnation involved only vacant land. The district judge said that the estate or interest taken was analogous to a tenancy from year to year, and that while not as easily susceptible of valuation as a fee yet the test of valuation was not insurmountable. He thought an expert appraiser could determine the fair annual rental and that the amount so found might be regarded .n future as the established and agreed rent of the premises as long as the government should elect to occupy them. He supported this view by the citation of some cases in the Court of Claims. He also thought that any threatened damage to the property upon the abandonment of it by the government could be made the basis of an original action by the property owner against the government. The New York case was substantially similar in its holding. But a quite different view was taken in the South Carolina case by District Judge Waring. In an extended opinion (51 F.Supp. 478) he held that the whole compensation despite the uncertainty of the duration of the taking, must be determined at once and for all by the jury, and that the property

owner could not be required to accept installment payments from time to time contingent upon the election by the government to continue leasehold occupation from year to year. In his summary, page 485 of 51 F.Supp., he said—

"It is the duty of a court to attempt as nearly as possible to put the owner in as good a place as he was before the taking. In my opinion he is entitled to receive a definite fixed payment representing the value of his property at the time of the taking. If this taking be of a fee simple title the rules under which to ascertain the compensation are well fixed and known. See particularly United States v. Miller [317 U.S. 369, 87 L.Ed. 336, 147 A.L.R. 55], supra. On the other hand, if the estate is anything less, then it is a question of fact for the jury to give due consideration to what, if anything, is left to the land owner, and when it has found the value of that it should be deducted from the full value of a fee simple title. This to me more nearly approaches a definition of just compensation and fair dealing with an owner than any other suggestions that have been made."

A substantially similar view was adopted in the California case as expressed in an also elaborate opinion by District Judge Goodman, 53 F.Supp. 767. On page 771 of 53 F.Supp. he said

"The government says it is obligated to and will return the hotel to the defendant in the same condition as received, wear and tear excepted, when it finally determines to end the lease. But 'just compensation' does not mean a promise, howsoever well intentioned, to perform an act in the future. The owners of the hotel are entitled to compensation for the taking, not their heirs in years to come, and then mayhap, after litigation in the Court of Claims, if there be one at the time. What would really happen if this theory were adopted, would be, as stated by Judge Waring in United States v. 9.94 Acres, supra, that condemnation cases would be tried piecemeal—a part of the compensation awarded now and a part years hence and then maybe only after new litigation."

In an earlier federal case, in re Condemnation of Lands for Military Camp, D.C.Ark., 250 F. 314, 315, arising under the Act of 1917, 50 U.S.C.A. § 171, during the First World War, the owner's compensation was held to be the fair rental value of his property, and that in addition

"the government must obligate itself, and the judgment will so provide, that, when it surrenders the land to the owner, it will be returned to him in as good a condition as when it took possession, the natural wear and tear excepted. * * * If the parties cannot agree upon the damages to be paid, if the government fails to put the land back in the condition it was, when it entered upon it, the court will, upon the application of either party, have a jury assess the damages, and for that purpose the court will retain jurisdiction of this cause."

None of these cases furnishes an entirely satisfactory solution of the difficulties in determining just compensation in a case where the government condemns merely temporary use of a presently indeterminate duration, and where it is uncertain what will be the condition of the property when the use terminates. I agree with Judges Waring and Goodman that in determining just compensation in federal condemnation cases the property owner may not be relegated to the necessity of future litigation to recover damages which may result from the government's occupation with consequent removal of or damages to buildings or land. The right to sue the government for such damages hereafter is permissive only, while the right to compensation to the property owner is constitutionally imperative. The determination of this just compensation is a judicial action in which the courts are charged with the responsibility of seeing that the constitutional mandate is complied with. Const. Amend. 5. Furthermore, the particular statutes here involved do not make any provision for subsequent damage suits against the government in the Court of Claims or under the Tucker Act, 24 Stat. 505. With respect to such damages, I think that the procedure adopted in the Arkansas case is the most reasonable, that is, an express provision in the judgment for retention of jurisdiction by the district court to hereafter determine the damages done to the property by the government's use if there be need therefor. I have some question as to whether this procedure is fully authorized, but it seems to me to be reasonable and equitable and not necessarily inconsistent with the Maryland procedure. The situation is unusual, but I

know of no rigid rule of procedure that forbids the practice. It would certainly be in accordance with the spirit of modern judicial procedure.

■ But I am not prepared to hold with Judges Waring and Goodman that the jury must now at once in determining just compensation award to the property owner a sum equal to the whole fee value of the property less only such amount of value as the jury may think remains in the property owner subject to the right of the government to use it for the somewhat indefinite period indicated in the petition for condemnation. As to that feature of damages, I take the view expressed in the Delaware case (50 F.Supp. 389) that is, that the jury should determine the fair annual rental value of the property to be paid by the government from year to year in accordance with its election to renew the use in accordance with the option. And in this connection the jury should also consider as an element of just compensation, the reasonable value of the option itself as an interest in or encumbrance on the property. That is to say, in determining the damages to which the property owner is now presently entitled, the jury in awarding the fixed annual rental for the first year should also include the fair value of the option given to the government for renewal, whether it is actually exercised or not. Then again the jury may consider, in determining the fair rental value, that it may differ from year to year. It is, however, not necessary now to precisely determine in detail just what the instruction to the jury should be in this respect. But the form of the inquisition to be found by the jury must be specially submitted and should make definite provisions with regard to filing of notice in writing in this Court of the exercise of the option to renew and prepayment of the sums for renewal to be determined by the inquisition.

■ There is another important element of damage in this case which the property owner will be entitled to have the jury consider and determine. By the lease between Pullman and Bethlehem the latter was required to restore the property to its condition as of March 18, 1941, the date of the lease. As has been said, great changes have been made in the improvements on the property since that date, in its conversion from a carbuilding plant to a shipbuilding plant. And under the lease the lessee was entitled to remove the improvements which it made in converting from carbuilding to shipbuilding. By the condemnation petition the government also has the right to make further improvements on the property with the right to remove the same. Pullman is clearly entitled to the benefit of the covenant in the lease for restoration of the property to its condition as of March 18, 1941. The termination of the lease by the action of the government in taking possession under the Second War Powers Act by this condemnation, has in legal effect terminated the lease and I assume has destroyed the right of Pullman to require Bethlehem to make the restoration. It therefore appears that Pullman will be entitled now at once to a determination of the reasonable cost of restoration of the property to its condition as of March 18, 1941. This will probably be an important element of just compensation to be determined by the jury.

■ The remaining question is whether the government by this proceeding has the power to condemn the temporary use of personal as distinct from real property. Counsel for Pullman contends that it has not this power, and it was so held by District Judge Goodman in the California case cited. As to this, he said (53 F.Supp. 771): "It (the statute) does not authorize the acquisition of the use of personal property. There is no ambiguity in the language of the statute. Such being the case, there is no necessity of resorting to Congressional debates to resolve the meaning of the Act." I do not agree with this view where the personal property is located on and used in connection with the real property which is condemned. I think the statute sufficiently clearly expresses the power to condemn the temporary use of personal property located on real property, or used therewith. It seems to me that this language clearly enough imports the meaning that where personal property is used with real property, a temporary use of both is authorized. As applied to an elaborate plant for manufacturing purposes, the land itself might be useless without its personal property equipment. And it is well known that in an elaborate manufacturing plant it may be often difficult to determine just what improvements on the property are in the legal class of removable fixtures and therefore personal property, or whether they are so affixed to the land as to constitute real property themselves. I think it would be

an unnecessary limitation on the necessary and important powers of the government in the exercise of eminent domain, to hold that the government must condemn and pay for the *whole* value of all such improvements on the property when it needs only the temporary use thereof. On the other hand, when the jury comes to fix the just compensation for the use of personal property used in connection with real estate, it will be very important to determine from the nature of the personal property and the uncertain extent of user thereof either of duration or character, what proportion of its whole value should be allowed to the property owner as just compensation. That is to say, it may well be that as to certain portions of the personal property compensation would be just only if full value is awarded. But this is a jury question dependent upon the facts and circumstances of the particular case.

It may fairly be said that the determination of just compensation in this case will be difficult, and seemingly involves so many uncertain factors that it tends to be speculative. But this results from the election of the government to seek an extent of temporary use as distinct from full ownership of the property and therefore the government cannot complain if the range of evidence with respect to just compensation is correspondingly great. And in the view I take of the matter the government has the full ability to protect itself against possibly excessive damages by an amendment of its petition for condemnation whereby the extent of the user taken will be made definite instead of presently uncertain. For instance, instead of condemning the use for one year with option for renewal for many years thereafter indeterminate in extent, the government might very well now limit by the present petition its condemnation of temporary use to one year, two years or three years definitely and certainly. And if the petition is so limited, I know no legal obstacle to the government hereafter and prior to the expiration of the term of user condemned, in-

stituting another and separate condemnation case for a further period of user. In this way the government can render certain what now is very uncertain and can greatly limit the otherwise speculative measure of damages which presently seems to inhere in the case. But for the reasons already stated, I do not think the court has the power to require an amendment of the petition in this way.

There remains the more limited question as to whether the present petition for condemnation is sufficiently certain and definite, as a mere matter of proper pleading, with respect to the personal property referred to as of March 18, 1941. And also whether the present petition is sufficiently certain in its description for identification of the various articles of purely personal property such as tools, etc. therein referred to. As to this, I must hold that the petition is not sufficiently certain. Clearly an effort to condemn the temporary use of personal property as of March 18, 1941, not presently stated to be situated on or used in connection with the property, seems to be unauthorized by the statute. Nor is it sufficiently described, merely as a matter of pleading. The owner contends that the purpose of the petition in this respect is in some way to avoid the obligation for restoration of the property as of March 18, 1941. But, as already indicated, that cannot properly be done in this case.

The final ruling on the pleadings therefore is that treating the government's motion as a demurrer to the Pullman answer, the motion should be sustained; but as under the Maryland practice and procedure the effect of the government's demurrer mounts to and opens up the legal sufficiency of the petition, I hold that the latter is too vague, indefinite and uncertain with respect to the personal property, the temporary use of which is sought to be determined, to be legally sufficient. The formal ruling on the pleadings, therefore, and on the questions raised by them, is that the petition for condemnation must be dismissed; but leave to amend within 30 days is hereby given.